**E-FILED**
Wednesday, 08 February, 2017  04:16:39 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JOHN E. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-3017 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant, | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff John E. Anderson appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Anderson is proceeding pro se. Anderson filed a document entitled Opening Brief (d/e 11) and a document entitled Motion for Error in Law (d/e 21).  The Court treated the Opening Brief as a motion for summary judgment and the Motion for Error in Law as a supplemental motion for summary judgment.  Text Order entered August 16, 2016.  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 29).  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  Consent to the Exercise of

Jurisdiction by a United States Magistrate Judge and Reference Order

entered June 29, 2016 (d/e 13).  For the reasons set forth below, the

Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Anderson was born on March 31, 1963, and completed high school.

He previously worked as a millwright in a steel mill.  Anderson alleged that

he became disabled on June 1, 2012.  Anderson suffers from degenerative

disc disease of the cervical and lumbar spine; arthritis of his dominant right

hand, especially the right thumb, post two crushing injuries and two

surgeries; headaches; obesity; and post-traumatic stress disorder (PTSD)

secondary to a facial burn injury in 2005.   Certified Transcript of

Proceedings before the Social Security Administration (d/e 8) (R.), at 11,

13-14, 20, 186.

In 1987, and again in 2000, Anderson was injured in motorcycle

accidents.[1]  His dominant right hand was crushed in each of these two

accidents.  Anderson had hand surgery after each accident.  Thereafter,

Anderson developed arthritis in his right hand and particularly in his right

thumb.  R. 315.

---

[1] Anderson once reported that the motorcycle accidents occurred in 1980 and 2002.  R. 255.

On April 5, 2012, Anderson had an x-ray of his cervical spine.  The x-ray showed severe disc space narrowing at C5-C6 and C6-C7, indicating degenerative disc disease at these levels.  R. 298.  On April 17, 2012, Anderson had an MRI of his cervical spine.  The MRI showed multilevel degenerative changes including severe right-sided neuroforaminal stenosis at C5-C6 and C6-C7, and moderate left-sided neuroforaminal stenosis at C6-C7.  R. 295.

On September 11, 2012, Anderson saw his primary care physician Dr. Randy Western, M.D., complaining of back pain; painful numbness in the third, fourth, fifth fingers, and thumb of his right hand; and chronic neck pain.  On examination, Anderson was in mild distress, had no areas of point tenderness in lumbosacral spine, but had some tenderness left of spine.  Straight leg raising tests caused some pain in the paralumbar area of his back.  Dr. Western found no leg weakness.  Dr. Western assessed a muscle spasm in his back.  R. 267.

On September 20, 2012, Anderson saw Dr. Western.  Anderson reported some intermittent weakness in his legs.  He reported that his employer's doctor would not let him return to work.  On examination, Anderson weighed 208 pounds, with a body-mass index of 30.81.  Anderson had some tenderness on palpitation around L5 area of his spine.

Dr. Western did not detect any weakness in Anderson's legs, but observed diminished reflexes in the right ankle.  Dr. Western ordered an MRI of Anderson's back.  R. 265.

On October 1, 2012, Anderson had an MRI of his lumbar spine.  The MRI showed degenerative changes with foraminal compromise at L4-L5 moderate on the right side and milder on the left side, and milder foraminal compromise at L3-L4.  R. 292-93.

On January 7, 2013, Anderson saw Dr. Western.  An unnamed orthopedic surgeon had offered Anderson additional surgery on his right hand. Anderson was reluctant because he had problems and complications with his prior surgeries.  Dr. Western stated that Anderson was "kind of in limbo in that we really cannot offer him much more besides surgery, but he cannot go back to work at his usual job with inability to use his right hand." R. 249.  On examination, Anderson had some muscle wasting and swelling around the right thumb, as well as 50% reduction in range of motion and loss of grip strength.  Anderson stated that he used his left hand more often "for everyday use because the right is just painful."  R. 249.

On February 5, 2013, Anderson had an x-ray of his right hand.  The x-ray showed advanced degenerative arthritis at the first CMC joint, some flattening at the base of the first metacarpal at the CMC joint, and some

degenerative change at the STT joint of the wrist.[2]  The radiologist

assessed "No acute abnormalities are identified.  Degenerative changes as

described."  R. 228.

On February 6, 2013, Anderson saw Physician's Assistant David

Purves, who worked with orthopedic surgeon Dr. Christopher Wottowa,

M.D.  Anderson reported pain with gripping and grasping tools at his prior

work.  He also reported numbness and tingling in his thumb, index, and

middle fingers when driving or riding his motorcycle.  He also experienced

numbness when using power tools.  R. 256.

Purves suspected carpal tunnel syndrome.  Purves also noted that

Anderson had posttraumatic changes in his first CMC joint and STT joint

arthrosis.  Purves believed that Anderson was a candidate for additional

surgery to relieve his symptoms in his right thumb.  Purves ordered an

EMG nerve conduction study to check for carpal tunnel syndrome.  R. 258.

On February 20, 2013, Anderson saw Physician's Assistant Purves.

Purves reviewed an EMG nerve conduction study with Anderson.  The

study showed no evidence of compression of the median nerves in

Anderson's wrists.  Purves stated that an x-ray taken at an earlier visit

---

[2] The first CMC joint is the carpometacarpal joint where the thumb meets the carpal bones in the wrist. The STT joint is the scaphotrapezio-trapezoidal joint, which is the joint between three bones in the wrist, the scaphoid, the trapezium, and the trapezoid.  See Dorland's Illustrated Medical Dictionary (32nd ed.) (Dorland's), at 298.

showed posttraumatic changes at the first CMC joint and degenerative changes at the STT joint.  Purves stated that Anderson would be a candidate for basal joint arthroplasty surgery.  Purves said the surgery would address the STT joint problems, but not all of Anderson's symptoms. Purves said injections would not affect the limited mobility in his thumb.  R. 255.

On March 1, 2013, Anderson saw Dr. Western to discuss Purves' recommendation to undergo surgery on his right thumb.  Anderson was reluctant to undergo a third surgery.  Dr. Western recommended going ahead with the surgery.  Dr. Western assessed permanent thumb damage from previous crush injuries.  Dr. Western gave Anderson a note that said "10 pound work restriction with his right hand and not to work above 3 feet." R. 253.

On April 9, 2013, Dr. Western filled out a form for Anderson's former employer regarding Anderson's impairments.  Dr. Western diagnosed Anderson with "Right thumb crushed in previous accident."  Dr. Western stated that Anderson was contemplating basal joint arthroplasty surgery. Dr. Western stated that Anderson was limited to ten pound weight restriction and no work above three feet.  R. 232.

On May 29, 2013, Anderson saw Dr. Western.  Anderson reported

pain and rash in his groin.  Dr. Western noted:

> Patient is here with this rash.  States that he went to go pick up
> a motorcycle for his friend, and it was like a 36-hour-type-trip,
> and then he had to mow the lawn for about 7 hours.  Then he
> developed this rash that at times is painful.

R. 251.  Dr. Western recommended methods to address the rash.  Id.

On July 25, 2013, state agency physician Dr. J.V. Corcoran, M.D.,

prepared a Residual Functional Capacity Assessment.  R. 63-66. Dr.

Corcoran opined that Anderson could lift twenty pounds occasionally and

ten pounds frequently; could stand and/or walk a total of six hours in an

eight-hour workday; could sit for a total of six hours in an eight-hour

workday; could occasionally climb ramps and stairs, balance, stoop, kneel,

crouch, and crawl; could never climb ladders, ropes, or scaffolds; and could

occasionally handle and finger with the right upper extremity, but had no

limitations with the left upper extremity.  Dr. Corcoran opined that Anderson

had to avoid concentrated exposure to hazards and unprotected heights.

R. 63-65.

On September 6, 2013, Anderson saw Dr. Western for a recheck of

his right thumb.  Dr. Western noted that Anderson was reluctant to undergo

another surgery on his thumb.  Dr. Western wrote, "Thus, it [the right

thumb] is in such bad shape he really cannot work either.  At least he

cannot go back to his standard customary job." R. 305. On examination, Dr. Western observed that "he can clamp down with his 2nd-5th fingers, but really cannot hardly use his first finger at all." Dr. Western assessed a "greatly diminished use of his right hand due to his severe thumb arthritis." Dr. Western concluded, "It is not that he could not do any type of work, it is just that he cannot go back and work safe in his usual work environment with his current job." R. 306.

On January 21, 2014, Dr. Western completed a form for Anderson's former employer. Dr. Western stated that Anderson could not work because he could not grip with his right hand. Dr. Western stated that Anderson had advanced/severe arthritis of the right thumb joint. R. 230.[3]

On March 12, 2014, state agency physician Dr. Vittal Chapa conducted a consultative examination of Anderson. Dr. Chapa described Anderson's dominant right hand and neck pain:

> The claimant states that he has problem with the right hand. He had crush injury to the right thumb. He had surgery on the right thumb in 1987 and year of 2000. He has no grip strength in the right hand. He is right-handed. He was told that his right thumb joint needs to be replaced. Occasionally, he has neck and back pain.

R. 315. Anderson's left hand grip strength was 5/5. Anderson could perform fine and gross manipulations with his left hand. R. 317.

---

[3] Dr. Western made the same statement on an undated form for Anderson's former employer. R. 231.

Anderson's right hand grip strength was 3/5.  Anderson had mild to

moderate difficulties performing manipulations such as opening door knobs

and tying shoes.  Anderson had severe difficulties buttoning and

unbuttoning.  R. 319.

Dr. Chapa observed that Anderson had limited range of motion in the

first CMC joint of his right thumb.  His range of motion in the right thumb

was 25% of normal.  He had full range of motion in all other joints.  His

lumbosacral spine flexion was normal and his straight leg testing was

negative.  R. 317.  Anderson could walk and bear weight without

ambulatory aids.  His gait was normal.  R. 316.

Dr. Chapa assessed status post right thumb injury.  Dr. Chapa

concluded:

> Summary and Discussion: The claimant is a 50-year-old male.
> He had two surgeries on the right thumb. He has limited
> functions of the right hand. He has impaired right handgrip.
> Rest of the physical examination is unremarkable. Please see
> the enclosed sheet of paper with the consultation report for right
> handgrip and right hand functions.

R. 317.

On March 14, 2014, state agency physician Dr. James Madison,

M.D., prepared a Residual Functional Capacity Assessment.  Dr. Madison

agreed with Dr. Corcoran's March 2013 assessment.  R. 75-78.  Dr.

Madison noted that Anderson "has a 10 lb weight restriction with his right hand and not to work above 3 ft." R. 76.

On June 20, 2014, Anderson saw neurologist Dr. Koteswara Narla, M.D., for headaches. Anderson reported that his headaches began when he strained his neck. Anderson reported that he had headaches on the left side with blurry vision, nausea, and vomiting. Anderson reported that bright lights bothered him. Anderson reported that the headaches came on when he did any active work. Anderson reported that he used to ride motorbikes. At this visit, Anderson was 69 inches tall and weighed 211 pounds, with a BMI of 31.16. Dr. Narla assessed headaches of the left frontal, most likely of the migraine nature. Dr. Narla stated that "Might be something exertional might be the cause." R. 339-40.

On September 16, 2014, Dr. Western wrote a letter summarizing Anderson's condition. R. 221. Dr. Western stated that he first treated Anderson in 2005 for PTSD resulting from a work-related explosion and facial burn injury. Dr. Western stated that, thereafter, Anderson had had intermittent problems sleeping which required medication. Dr. Western discussed Anderson's right hand:

> Also well documented is his couple of surgeries he has already
> had on his right hand, resultant arthritis that we have seen in
> our x-rays, and his main disability that keeps him from working
> because he cannot grab his tools, torches, etc., all the

implements needed to work he cannot do because his hand is
weak and painful.

R. 221.  Dr. Western then noted Anderson's neck problems:

> In addition to the above, he also has had neck pain leading to
> headaches, migraines.  These had responded to medications
> as well as cervical blocks.  He had an MRI done that showed
> neuroforaminal stenosis that is severe on the right side
> between C5-C6, C6-C7.

R. 221.  Dr. Western concluded:

> Thus, in summary, he has had psychological issues relating
> from a burn from an explosion that has left him with some
> insomnia, right hand arthritis producing weakness and some
> neurologic symptoms, as well as some degenerative disease in
> his neck that contributes to his headaches.

R. 221.

On December 11, 2014, Anderson went to see Dr. Western.

Anderson reported frequent headaches.  At that time, Anderson weighed

216 pounds and had a BMI of 31.90.  Dr. Western noted that Anderson had

chronic headaches.  Dr. Western noted that injections had previously

"given him years (sic) work of relief."  R. 334.  On examination, Dr. Western

observed a loss of about 20 degrees of motion when turning Anderson's

head to the left.  Dr. Western assessed "Headaches muscle tension chronic

right arm hand pain that is stable currently retired due to his injury".  Dr.

Western mentioned the possibility of a nerve block.  R. 334.  On January

15, 2015, neurologist Dr. David Gelber, M.D., administered trigger point injections in Anderson's cervical paraspinous muscles bilaterally.  R. 332.

<u>THE EVIDENTIARY HEARING</u>

On June 15, 2015, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  Anderson appeared pro se.  Vocational expert Dr. James Lanier, Ph.D., also appeared.  R. 28; <u>see</u> R. 215 (Dr. Lanier's resume).  The ALJ informed Anderson of his right to secure an attorney or qualified non-attorney representative to represent him in the hearing.  Anderson elected to proceed pro se.  R. 28-29.

Anderson testified that he lived with his wife in a single-family dwelling.  Anderson stated that he drove about 30 miles a week.  Anderson had a twelfth grade education.  He worked at a steel mill from 1988 until he stopped working on June 1, 2012.   He attempted to return to his job in 2012 and 2013, but only stayed at work each time for few weeks to a few months.  His last attempt to return to work ended on March 1, 2013.  R. 35.

Anderson stated that he did not have any limits on his ability to drive. He explained that he usually drove with his left hand because driving with his right hand caused pain.  R. 34.

Anderson said that he believed he was disabled because, "I have a lot of problems with my thumb, my right hand, and some, my neck, and my

back." R. 36.  Anderson could not say whether his thumb or his neck was his primary problem.  He stated that his thumb hurt "all the time," but his neck pain was "occasional."  R. 38.

Anderson testified that he took tramadol and hydrocodone for the pain.  He took hydrocodone only in "extreme cases" of neck, back, or thumb pain.  R. 36.  Anderson stated that the tramadol and hydrocodone worked sometimes:

> It's strange.  Sometimes it does and sometimes it doesn't. Actually, the hydrocodone has made my head hurt worse sometimes, and I'm not sure why.  I did have an MRI on my head, thinking that possibly I was getting a blood clot or something in my head causing the bad headaches, and I was pretty sure it was coming from the neck.  When the neck hurt, the head hurt.  But the hydrocodone would sometimes make it worse, so it would make my head hurt worse.

R. 37-38.  Anderson rated his general pain as a 6 on a scale of 1 to 10.  He testified that the pain medication reduced the pain to a 5.  He testified that his medication "barely takes the edge off."  R. 39.  He stated that he also received injections periodically for pain.  R. 37.  He also took amitriptyline. He said that the amitriptyline helped.  R. 38.

Anderson stated that if he used his right hand his pain increased to an 8 or 9.  For the last couple of years, he did almost everything with his left hand.  If he used his right hand, he used his fingers instead of his thumb.  R. 39-40.

Anderson said that his neck pain radiated down his left shoulder blade if he leaned forward or sat in certain positions.  R. 40.  He said that turning his head also sometimes caused pain:

Q And are there any sort of maneuvers that you do that make it worse?

A Yes, just about everything.  I mean, it seems like even when I'm turning my head. A lot of times, it goes up the left side of my neck and I can feel it going up right behind my ear and right in my temple area, and that's why I'm so sure is coming from the neck, because the headache gets so severe I'm just about better on the days it happens – I don't want to move.  I just want to sleep all day, and hopefully I'll wake up the next morning and it's gone. But sometimes, it's lasted for three days.  And when it's lasted over a day and a half or two, that's when I go to Dr. Western.  I get a Torterol shot.

R. 41.  Anderson stated that the Torterol shots "seem to help." R. 42.

Anderson testified that he also had incapacitating headaches five or six times a month.  The headaches lasted "[a] day or a day and a half."  He stated that he sometimes vomited when he had headaches.  R. 42.  Anderson rated his headache pain at a 10.  R. 43.  Anderson testified that when he had a headache, he lay in bed and tried not to move.  He also put ice on his temple or the spot where his head was hurting.  R. 43.

Anderson testified that he decided not to undergo a third surgery on his thumb after discussing the matter with Dr. Wottawa:

I've seen Dr. Wottawa was and they said that, you know, actually, the first thing he said when he came back in the room

after the MRI or whatever I had, he said, "You can't even lie about this."  He said, "It's really bad." He said -- told me about, you know, what that possibly could do, and he could not guarantee that it wouldn't make it -- would make it any better, a third surgery.  And during the surgery, they said they'd have to replace the whole joint bone down there and they'd have to clean up around the thumb. And there's a bone that sticking out of my hand also.  They'd have to replace that bone with a tendon out of my arm. You know, wad it up, like in a knot, and replace it in, like, where the bone is sticking out of my hand. Anyway, they didn't guarantee and they did say that the first six months, you're going to regret it because of the pain, and I said, "Well, I've gone through this twice already and I knew about the pain." But they couldn't guarantee it and I didn't feel comfortable with it at all.

R. 38-39.

Anderson had not considered undergoing back or neck surgery because he "always heard bad things about neck surgery or back surgery." R. 40.  Anderson had not tried physical therapy for his neck or back.  He explained, "I try not to agitate it."  R. 41. No one ever recommended back or neck surgery to Anderson.  R. 40.

Anderson testified that he could sit for an hour to an hour and a half before changing positions, and he could walk for a mile.  R. 44.

In a typical day, Anderson said that he did a little housecleaning; mowed the yard on a riding mower; did laundry, including folding laundry; did some cooking, including using the microwave and making brownies from a mix; and vacuuming.  He did everything with his left hand.  He drove

the mower with his left hand, he stirred the brownie mix with his left hand, and he ran the vacuum with his left hand.  He testified that using his left hand caused pain in his right side and sometimes caused headaches.   He testified that mowing "really does a number on my neck and my back."  R. 45.

Anderson said that he did not know how much he could lift comfortably.  He said that his doctor limited him to lifting 10 pounds.  He estimated that the 10 pound restriction limited him to carrying nothing heavier than a gallon of milk.  He stated, "And I have lifted over that, I'm sure, but, you know, I know I pay for it, you know, through the pain, too."  R. 46.  Anderson went grocery shopping alone.  He testified that he bagged the groceries himself so that each bag was light.  He took several trips from his car to carry the bags into his house.  R. 48.

Anderson went to church regularly and to social activities with his family.  R. 48.

Anderson testified about trying to ride his motorcycle:

Q. Do you still ride your motorcycles?

A. I tried and I've regretted it. The neck pain and the hand pain is, you know – things I do, I just regret doing it, and I hate that I can't, either, you know, just bother me because I love it.

Q. When is the last time you rode it?

A. Maybe a few months ago, I guess.

Q. Do you have hand brakes that you use [phonetic]?

A. Excuse me?

Q. Do you have hand brakes or mechanisms on the right that you have to maneuver in order to operate the motorcycle?

A. Well, it's just the start button, I guess, and the push button for the turn signal.  And the motorcycle I have, it can—actually, it has cruise control, so I only have to use my right hand.  I can just set it on top of there, you know, so I don't -- yeah, so I try not to ride around town or anything to do it.  It's just occasionally, I guess it's just gotten worse.  You know, it's just the hands' gotten worse, you know, over time here.

Q. And when you last went, where did you go?

A. Where did I go?  I think I rode into Mechanicsburg [phonetic], which is about six miles -- six miles in, five miles back.

R. 48-49.

Vocational expert Dr. Lanier then testified.  The ALJ asked Dr. Lanier

the following hypothetical question:

Q. Okay.  I would like you to consider a hypothetical claimant of the same age, education, and the same past work as this claimant, limited to a range of light work with occasional climbing of ramps and stairs; no ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and frequent but not constant handling and fingering with the right dominant hand; avoid concentrated exposure to unprotected hazards and unprotected heights; no work with vibrating tools; no concentrated exposure to loud noise, and I mean factory level noise.  Is there any past work he could perform with that -- those limitations?

R. 54-55.  Dr. Lanier opined that such a person could not do any of

Anderson's past work.  Dr. Lanier opined that such a person could perform

some light, unskilled jobs including router, with 3,415 such jobs existing in

Illinois and 74,463 nationally; and mail sorter, with 1,200 such jobs existing

in Illinois and 32,000 nationally.  R. 55.

> The ALJ changed the hypothetical question:

> Q. If our hypothetical claimant could only occasionally perform
> handling with the right dominant hand and he could perform
> frequent but not constant fingering with the right dominant
> hand, and using all the other limitations of the first hypothetical,
> would he have jobs that he could perform?

R. 56.  Dr. Lanier opined that such a person could perform the unskilled

jobs of rental clerk, with 3,400 such jobs existing in Illinois and 83,000

nationally; laminating machine off-bearer, with 400 such jobs existing in

Illinois and 82,000 nationally.  R. 56.

Dr. Lanier opined that such a person could not work if he had to miss

work two days a month due to headaches, or if he was off task up to 20

percent of the industrial standard due to problems with concentration and

attention due to pain.  R. 56-57.  The ALJ concluded the hearing.

## THE DECISION OF THE ALJ

On July 28, 2015, the ALJ issued her decision.  R. 11-21.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that he is disabled regardless of his age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ found that Anderson met his burden at Steps 1 and 2.

Anderson had not engaged in substantial gainful activity since July 1, 2012,

and he suffered from the severe impairments of degenerative disc disease

of the cervical and lumbar spine, osteoarthrosis, headaches and obesity.

R. 13.  At Step 3, the ALJ found that Anderson's impairments, or

combination of impairments did not meet or equal any Listing.  R. 14-15.

At Step 4, the ALJ found that Anderson had the following RFC:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b) except he
> can never climb ladders, ropes or scaffolds, but can
> occasionally climb ramps and stairs, and can occasionally
> balance, stoop, kneel, crouch and crawl; he can frequently, but
> not constantly, engage in fingering activities with the light, and
> dominant, hand, and can, only occasionally, partake in handling
> with the right hand; he must avoid concentrated exposure to
> unprotected work hazards and heights, can never work with
> vibrating tools and can never be exposed to loud(factory level)
> noise.

R. 15.  The ALJ relied on Dr. Chapa's consultative examination and the opinions of Drs. Corcoran and Madison.  The ALJ also relied on medical records of the conservative treatment of his back and neck and negative straight leg raising tests.  Additionally, the ALJ relied on evidence that Anderson responded well to trigger point injections for pain in his neck. R. 16-18

The ALJ found that Dr. Western's opinions that Anderson was disabled or could not work were not entitled to controlling weight.  The ALJ found that Dr. Western indicated that Anderson was limited to a 10 pound weight lifting restriction, but the medical evidence showed that the restriction only applied to Anderson's right hand, not his left.  The ALJ found that Dr. Western's statements that Anderson could not perform his former work or work in his former work environment did not address whether he could work at all.  R. 18-19.

The ALJ also found Anderson's testimony and other claims of total disability not to be credible.  The ALJ found that the medical evidence was inconsistent with his claims.  The ALJ relied on medical evidence that showed that his back and neck were not severe enough to limit his functional capacity beyond the RFC that the ALJ determined.  The ALJ noted the February 5, 2013, x-ray of Anderson's thumb that showed

advanced degenerative arthritis of the CMC joint of the right thumb, but no

acute abnormalities.  R. 19.

The ALJ also found that Anderson's activities were inconsistent with

his claims of total disability.  The ALJ stated:

> At various times in the record, the claimant admitted that he
> was capable of daily activities, such as cooking, cleaning and
> personal care and hygiene.  On February 6 and May 29, 2013,
> the claimant was still riding motor cycles extensively.  On the
> latter occasion, he reported that he had recently gone to pick up
> a motorcycle for a friend; it was a 36-hour-type trip, and then he
> had to mow the lawn for about 7 hours.  In May of 2014, the
> claimant's lumbar spine impairment was described as a minimal
> tiny disc protrusion at L3-4.  While he complained of cervical
> pain and left-sided headaches, he admitted that he was able to
> put up with the neck and back pain without any problem, with
> intermittent use of Hydrocodone.

R. 19.  In light of this evidence, the ALJ found that Anderson's claims of

total disability were not credible.

Based on the RFC determination, the ALJ concluded at Step 4 that

Anderson could not return to his past relevant work as a millwright.

At Step 5, the ALJ found that Anderson could perform a significant

number of jobs that exist in the national economy.  The ALJ relied on the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2;

and the opinions of Dr. Lanier that a person with Anderson's age,

education, experience, and RFC could perform the jobs of rental clerk, and

laminator machine off-bearer.  R. 20-21.  The ALJ found that Anderson was not disabled.  R. 21.

EVIDENCE SUBMITTED ON APPEAL

Anderson appealed the decision of the ALJ.  Anderson submitted additional medical evidence from an office visit with Dr. Western on August 21, 2015.  An x-ray showed severe changes of posttraumatic osteoarthritis at the basal joint of the thumb, and severe triscaphe joint osteoarthritis. R. 360.

Dr. Western examined Anderson and completed a form called "Arthritic Report (Degenerative or Inflammatory)."  R. 356-58.  Dr. Western diagnosed Anderson with severe arthropathy of the CMC joint and STT joint.  Dr. Western observed warmth in the CMC joint and swelling in the distal radial wrist and proximal 1/2 of the thumb.   Dr. Western rated Anderson's right grip strength as 2/5 and his left at 5/5.  Dr. Western rated the right thumb strength at 2/5.  Dr. Western observed numbness in the first, second, and third right fingers.  Dr. Western assessed significant limitations in repetitive reaching, handling, and fingering with the right hand, but no limitations with the left hand.  Dr. Western opined that Anderson could rarely grasp and twist with his right hand (five to ten times a day). Dr. Western agreed with Dr. Chapa that Anderson had mild to moderate

difficulties with manipulative actions such as opening door knobs and tying

shoe laces, and severe difficulties with one manipulative function of

buttoning and unbuttoning.  R. 356-58.  Dr. Western opined that the only

possible treatment was surgery, but the outcome was uncertain;

> Surgery is a possible treatment but there is no guarantee that
> will alleviate his symptoms & restrictions of movement.  This
> surgery may somewhat alleviate his symptoms.  2 previous
> surgeries have failed.

R. 358.  Dr. Western concluded:

> Restrictions remain same.  10 pound weight restriction right
> hand.  No working greater 3 feet off ground due to fall risk.

R. 358.

On November 23, 2015, the Appeals Council denied Anderson's

request for review.  The decision of the ALJ then became the final decision

of the Commissioner.  R. 1.  Anderson then filed this action for judicial

review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The ALJ's RFC determination was supported by substantial evidence.

The RFC determination was supported generally by the opinions of Drs.

Corcoran and Madison.  Dr. Chapa's consultative examination also

supported the finding.  Dr. Chapa found that Anderson was not limited in

the use of his left hand.  He also found no limitation on range of motion

other than his right hand.  Dr. Chapa also found no limitations in

Anderson's ability to walk and found negative straight leg testing.  These findings support the ALJ's RFC determination that Anderson could perform a limited range of light work.

Dr. Western's findings were also generally consistent with the ALJ's RFC determination.  Dr. Western limited Anderson to lifting ten pounds; however, at least once before the ALJ's determination, Dr. Western restricted that limitation to lifting with Anderson's right hand.  R. 253.  After the ALJ's decision, Dr. Western restated that the ten pound lifting limitation was restricted to Anderson's right hand.  R. 358.[4]  The lack of a lifting restriction on Anderson's left hand is consistent with the finding that he could do a limited range of light work.  Dr. Western also stated at various times that Anderson could not return to work.  Specifically, Dr. Western explained: "It is not that he could not do any type of work, it is just that he cannot go back and work safe in his usual work environment with his current job."  See R. 306.  The ALJ's RFC finding of a limited range of light work was consistent with Dr. Western's observation about Anderson's prior work as a millwright in a steel mill.  The job was far more strenuous than lifting twenty pounds occasionally and ten pounds frequently.

---

[4] Courts generally only consider evidence that was before the ALJ when deciding whether the ALJ's decision was supported by substantial evidence.  See Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  The Commissioner in this case did not challenge Anderson's reliance on the evidence filed with the Appeals Council, so the Court does not address this issue.

The Court questioned whether the ALJ's finding that Anderson could finger frequently was supported by substantial evidence since Drs. Corcoran and Madison limited Anderson to occasional fingering.[5]  Notice Under Federal Rule of Civil Procedure 56(f)(2) and Order (d/e 35) (Rule 56 Notice), at 4-5.  The Commissioner responded convincingly that any error in this regard was harmless.  Dr. Lanier opined that a person with Anderson's age, education, work experience, and RFC could perform the job of laminator machine off-bearer.  The Commissioner correctly noted that Dictionary of Occupational Titles (DOT) states that the job of laminator machine off-bearer only required occasional fingering.  DOT 569.686-046 Laminating—Machine Offbearer, 1991 WL 683893 (4ed. 1991).  Dr. Lanier opined that 82,000 such jobs existed nationally.  This number of jobs is more than enough to show at Step 5 of the Analysis that Anderson could perform a significant number of jobs that exist in the national economy.  See Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) ("1,000 jobs is a significant number" sufficient to meet the Commissioner's burden at Step 5).  Thus, even if the ALJ erred in explaining why she did not limit Anderson's RFC to occasional fingering, the error was harmless as one of

---

[5] The Commissioner argues that the Court erred in raising this issue on its own.  The Commissioner is incorrect.  The matter is before this Court on cross motions for summary judgment.  The Court can decide summary judgment motions on issues not raised by the parties as long as the Court gives notice and reasonable time to respond.  Fed. R. Civ. P. 56(f)(2).  The Court did so.  See Rule 56 Notice.

the selected occupational titles required only occasional fingering.  See McKenzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011) (An error is harmless if the record shows the error clearly would not change the outcome).

Anderson argues that the ALJ erred in not following Dr. Western's opinion.  The ALJ must give a treating physician's opinion controlling weight when the opinion is well supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527; see SSR 96-2p.  Dr. Western limited Anderson to lifting ten pounds, but elsewhere limited that lifting restriction only to Anderson's right hand, both before and after the ALJ's determination.  R. 253, 358.  The ALJ could reasonably conclude that the absolute restriction to lifting ten pounds was not entitled to controlling weight because the finding was inconsistent with other evidence in the record, including Dr. Western's own statements that the lifting restriction only applied to Anderson's right hand and Dr. Chapa's finding that Anderson was not restricted in his use of his left hand.  The ALJ did not err in finding that Dr. Western's lifting restriction for both hands was not entitled to controlling weight.

Dr. Western also stated that Anderson could not work, but limited his opinion to whether Anderson could return to his prior work as a millwright in a steel mill.  The ALJ could properly conclude that these opinions did not address whether Anderson could work other types of jobs.  In fact, Dr. Western specifically stated his opinion that: "It is <u>not</u> that he could not do any type of work."  (emphasis added)  The decision not to give these statements controlling weight was also supported by substantial evidence.

Anderson argues that he gets severe headaches and that he does not want to move on the days that the headaches happen.  He also points to a neurological visit in June of 2014 in which he reported cervical pain and headaches on the left side lasting up to one day (d/e 11, pg. 5).  He asks that these headaches be considered in combination with his other conditions in Dr. Western's medical opinion regarding his ability to lift over ten pounds.  The diagnosis of the headaches referred to by Anderson indicates that the cause of his headaches may be exertional, based, in part, on Anderson's statement that exertion causes the headaches.  R. 340. Anderson had previously reported that he experiences headaches which come on when he bends and strains himself and lifts weights.  R. 341.  As noted, Anderson claims the onset date of June 1, 2012.  Prior to  the onset date, Anderson experienced these exertional headaches when participating

in strenuous physical activity.  He reported he experienced severe headaches the day after moving 55 gallon barrels.  He indicated he started vomiting from neck pain after moving the barrels and had severe headaches on his left side of his neck and head.  Anderson made this report on April 5, 2012.  R. 729.  In March of 2012, Anderson reported that any time he lifts anything heavy, it sometimes will set off a headache.  R. 282.  It would appear that the exertional headaches would not be implicated in the limited range of light work permitted by the ALJ's RFC finding.

Anderson also argues that the ALJ erred in his credibility assessment. The ALJ used the term "credibility" in his decision because the Social Security Administration instructed him to do so at the time.  See SSR 96-7p.  The Social Security Administration has now decided to stop using the term credibility in evaluating evidence about symptoms.  SSR 16-3p, 2016 WL 1119029 at *1 (March16, 2016).  Courts "generally defer to an agency's interpretations of the legal regime it is charged with administrating." Liskowitz, 559 F.3d at 744.  The Commissioner asserts that the substantive aspects of SSR 16-3p do not apply retroactively. (Commissioner's Memorandum in Support of Motion for Summary Affirmance T5, Fn. 1)  The Commissioner's assertion is incorrect.  The

interpretive rules set forth in SSR 16-3p applies retroactively to this Court's review of the ALJ's decision in this case.  See Srp v. Colvin, 2016 WL 4487831, at *5 (C.D. Ill. August 25, 2016).

The ALJ's analysis met the requirements set forth in SSR 16-3p.  The Social Security Administration stated in SSR 16-3p that the adjudicator, such as the ALJ, must evaluate statements regarding the intensity, persistence, and limiting effects of pain in light of all of the evidence in the record, including the medical evidence.  The Social Security Administration stated, "We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings in the record."  The Social Security Administration explained that when objective medical test results are not consistent with the individual's statement about his symptoms, the objective medical evidence "may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with the other evidence in the record."  SSR 16-3p, 2016 WL 1119029 at *5.

The ALJ found that Anderson's claims of disabling pain were inconsistent with the medical evidence that showed a less severe condition. The ALJ also found that Anderson's daily activities, such as cooking,

cleaning, vacuuming, and mowing were inconsistent with his testimony about the limiting effects of his pain.  In light of this evidence, the Court cannot say that the ALJ's evaluation of Anderson's statements regarding the intensity, persistence, and limiting effects of pain were patently wrong. See Pepper, 712 F.3d at 367.

Anderson argues that the ALJ incorrectly found that Anderson rode his motorcycle extensively.  The Court agrees that the ALJ's finding about Anderson's motorcycle riding was not supported by the record.  The ALJ found that on February 6 and May 29, 2013, Anderson reported to his doctors that he rode his motorcycle extensively.  R. 19.  Anderson did not so report to his doctors.  On February 6, 2013, Anderson reported that he had pain in his right hand while riding motorcycles.  R. 256.  He did not report that he rode motorcycles extensively.  On May 29, 2013, Anderson reported that he went on a thirty-six hour trip to pick up a motorcycle for a friend, and then mowed his yard for seven hours when he got home.  R. 251.  Anderson did not say that he rode a motorcycle for thirty-six hours. He went on a trip to pick up a motorcycle.  The evidence does not support the ALJ's finding that Anderson rode motorcycles extensively.  This was error.

Anderson also argues that the ALJ improperly relied on a statement in a February 5, 2013 x-ray report that Anderson did not have acute abnormalities in his thumb. Anderson is correct that the lack of acute abnormalities was not material. The term acute means "having a short and relatively severe course." Dorland's, at 24. Anderson's injuries were not acute—rather his injuries were chronic and the resulting arthritis of his thumb and wrist were longstanding and severe. According to the February 5, 2013 x-ray report, Anderson's long-standing problem resulting in advanced degenerative arthritis. The lack of a new, acute condition was not material to the question of the severity of the limiting effect of the longstanding advanced arthritis in Anderson's thumb. The ALJ's reliance on the lack of an acute abnormality was error.

The ALJ made these errors as part of her evaluation of Anderson's statements regarding the intensity, persistence, and limiting effects of pain, formerly known as the credibility determination. The Seventh Circuit has stated that credibility findings, now findings regarding the claimant's statements regarding the intensity, persistence, and limiting effects of pain, will not be disturbed unless they are patently wrong and lack any support in the record. Pepper, 712 F.3d at 367; Elder, 529 F.3d at 413-14. In this case, the ALJ's findings were supported by other evidence cited by the

ALJ.  The objective medical evidence cited by the ALJ showed severe problems with Anderson's right hand, but less severe problems with Anderson's back and neck.  The ALJ also cited Anderson's testimony that he regularly cooked, cleaned, vacuumed, and mowed.  The ALJ cited the fact that Anderson mowed his lawn for seven hours after taking a thirty-six hour trip.  The ALJ erroneously concluded that Anderson rode a motorcycle for thirty-six hours, but Anderson still made a thirty-six hour trip and then mowed his lawn for seven hours.   The ALJ could properly rely on this evidence to discount the probative value of Anderson's statements regarding the intensity, persistence, and limiting effects of pain. The ALJ's errors regarding motorcycle riding and the lack of acute abnormalities did not render his overall evaluation of Anderson's statements regarding the intensity, persistence, and limiting effects of pain patently wrong.  Therefore, the Court will not reverse on this basis.

THEREFORE, Defendant Commissioner's Motion for Summary Affirmance (d/e 29) is ALLOWED; Plaintiff Anderson's Opening Brief (d/e 11) and Motion for Error in Law (d/e 21) are DENIED; and the decision of the Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:  February 8, 2017         *s/ Tom Schanzle-Haskins*
                                UNITED STATES MAGISTRATE JUDGE